## UNITED STATES of America

v.

## George LECCO.

## Criminal Action No. 2:05–00107–01.

United States District Court, S.D. West Virginia, at Charleston.

April 6, 2007.

---

## SEALED EX PARTE MEMORANDUM OPINION AND ORDER

COPENHAVER, District Judge.

Pending are defendant George Lecco's ex parte, sealed motion in limine to permit testimony by his penalty phase expert, filed March 14, 2007, and the government's motion to exclude the expert witness' testimony, filed March 21, 2007.

At a hearing held March 23, 2007, came the defendant, George Lecco, in person and by counsel, Jay T. McCamic and Mary Lou Newberger, Federal Public Defender, and came the United States, by Fred B. Westfall, Jr., Assistant United States Attorney, Civil Division, for a hearing on the motions.[1]

---

1. Mr. Westfall was jointly selected by all parties to serve as "fire-walled" counsel for the government in this matter. The "fire-walled" designation reflects one element of the parties' mutually agreed upon protocol for handling the procurement and development of mental status information relating to the defendants should a penalty phase become necessary. As noted by one court,

> [f]irewalls ... serve two purposes: (1) "to avoid impermissible use by the government

[in the trial phase] of the information obtained from the [mental condition] examinations" and (2) "to prevent delay at the sentencing stage if the defendant [chooses] to introduce evidence regarding mental condition as a mitigating factor."

United States v. Wilson, No. 04–CR–1016, 2006 WL 3544709, at *1 (E.D.N.Y. Dec. 8, 2006) (quoting United States v. Karake, No. 02–CR–0256, 2006 WL 623676, at *1 (D.D.C. Mar.6, 2006)) (citing United States v. Johnson,

## I.

On February 20, 2007, the court entered the Provisionally Sealed Order Regarding Government Mental Status Evaluations ("order") presented to it in agreed form by counsel for all parties. The order directed defendant to provide to fire-walled counsel the names, resumes, and areas of expertise of the mental health experts who performed any examinations upon him and the nature of the examinations and the tests administered.

On February 27, 2007, counsel for the defendant disclosed to Mr. Westfall that Dr. Mace Beckson would serve in an expert capacity for the defense with regard to mental health issues if a penalty phase became necessary. Defendant contends Dr. Beckson's testimony would be "a major portion of the mitigation presentation...." (Mot. in Lim. at 1).[2]

Upon reviewing the curriculum vitae, Mr. Westfall observed that Dr. Beckson was employed, on a part-time basis, by the Department of Veterans Affairs ("VA") at the Greater Los Angeles Healthcare System. Dr. Beckson is also employed as a university professor, a private physician treating patients, and a forensic psychiatrist.

Mr. Westfall, perhaps by virtue of his service in the civil division, was aware of certain regulations, discussed more fully within, that potentially impacted Dr. Beckson's ability to testify as an expert witness for defendant. Neither counsel for the defendant nor Dr. Beckson were aware of the regulations. Mr. Westfall contacted the VA to determine whether Dr. Beckson had been authorized to serve as an expert witness in this action. Mr. Westfall eventually spoke with Walter A. Hall, Assistant General Counsel at the VA and its Designated Agency Ethics Official ("DAEO"). Mr. Hall advised that Dr. Beckson had not received authorization.

At some unstated date thereafter, Mr. Westfall contacted counsel for the defendant, recounted in detail the rules governing Dr. Beckson, and noted that the VA had not authorized the physician to serve as an expert witness for the defendant. Approximately 1–2 days later, Mr. Westfall reduced his position to writing at the request of defense counsel to facilitate counsel's further discussions with Dr. Beckson.

On March 6, 2007, defense counsel advised they were following up on the situation and that they were also investigating the retention of a substitute expert should Dr. Beckson's further involvement be precluded. Defense counsel also asked Mr. Westfall to contact the VA and determine

---

362 F.Supp.2d 1043, 1083 (N.D.Iowa 2005); *United States v. Sampson,* 335 F.Supp.2d 166, 245 (D.Mass.2004)).

**2.** Further attesting to his importance to the defense case, and the unavailability of suitable substitutes, are the following statements by defense counsel at the March 23, 2007, hearing:

Qualified psychiatrists ... to testify when a man's life is at stake are not a dime a dozen.... [They] are very few and far between. Those individuals are very busy. Counsel has made innumerable phone calls to various experts, referring experts and you name it, to try to find somebody to replace Dr. Beckson.

This is a specific issue which we have alerted the other side to of addiction and substance abuse, and that area further refines your search.... [T]his area is somewhat unique.

The defendant has [also] already established a relationship with the psychiatrist.

(Trans. at 16–17). As recently as April 2, 2007, the defendant advised it had "talked to numerous experts in an attempt to secure an appropriate [replacement] expert.... No such replacement expert has been retained, no testing has been performed, and thus no results are available." (Def.'s Resp. to Mot. to Mod. at 2–3).

if it would waive the restrictions it had imposed upon Dr. Beckson's participation in this capital case.

On March 9, 2007, defense counsel was advised that a waiver would not be forthcoming inasmuch as the government was a party to this criminal action and Dr. Beckson would be testifying against the interests of the United States. As of this date, the court has not been notified by defendant that he has succeeded in his attempts to find a suitable expert to serve in Dr. Beckson's stead.

## II.

In *Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951), the Supreme Court was confronted by a Department of Justice subordinate's refusal to submit papers to the district court in response to its subpoena duces tecum. The subordinate contended that he was prohibited from compliance by virtue of a certain executive order. The Supreme Court observed as follows:

> We think that Order No. 3229 is valid and that ... [the subordinate] in this case properly refused to produce these papers....
>
> When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious. Hence, it was appropriate for the Attorney General, pursuant to the authority given him by 5 U.S.C. s 22, 5 U.S.C.A. s 22, to prescribe regulations not inconsistent with law for 'the custody, use, and preserva-

tion of the records, papers, and property appertaining to' the Department of Justice, to promulgate Order 3229.

*Id.* at 468, 71 S.Ct. 416. Fifty-six years later, *Touhy* is yet recognized in this circuit and elsewhere as the legal source for the right of a federal agency to exercise control over its resources, including its employees sought by others for litigation purposes. *See, e.g., Smith v. Cromer,* 159 F.3d 875, 878 (4th Cir.1998); *Distaff, Inc. v. Springfield Contracting Corp.,* 984 F.2d 108, 112 (4th Cir.1993); *Boron Oil Co. v. Downie,* 873 F.2d 67, 71 (4th Cir.1989).[3]

Later, in *Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990), the government instituted a civil action against, *inter alia,* The Boeing Company. The government alleged that certain payments the corporation made to five outgoing employees entering government service created a conflict of interest situation. The government claimed Boeing induced a breach of the fiduciary duty of undivided loyalty which each of the five individuals owed to the government. Consistent with *Touhy,* the Supreme Court observed generally as follows:

> Congress appropriately enacts prophylactic rules that are intended to prevent even the appearance of wrongdoing and that may apply to conduct that has caused no actual injury to the United States. [Title 18 U.S.C.] Section 209(a) is such a rule. Legislation designed to prohibit and to avoid potential conflicts of interest in the performance of governmental service is supported by the legitimate interest in maintaining the public's confidence in the integrity of the federal service. Neither good faith, nor full disclosure, nor exemplary performance of

---

**3.** The court has carefully examined our court of appeals' precedent for guidance on the issues presented here. As will become apparent, the factual and legal setting in this action is distinct from the circumstances in the Fourth Circuit appellate cases cited above and reviewed by the court.

public office will excuse the making or receipt of a prohibited payment. It is nevertheless appropriate, in a case that raises questions about the scope of the prohibition, to identify the specific policies that the provision serves as well as those that counsel against reading it too broadly.

*Id.* at 164–65, 110 S.Ct. 997 (footnote omitted).

As is apparent from the foregoing authorities, Congress and the Executive Branch have enjoyed a rather long history of controlling both the disclosure of agency records and the outside activities of federal government employees. A variety of statutes provide the Executive Branch the discretion to promulgate regulations to achieve that very end. *See, e.g.,* 5 U.S.C. § 7301 ("The President may prescribe regulations for the conduct of employees in the executive branch."); 5 U.S.C. § 7351(b) ("Each supervising ethics office . . . is authorized to issue regulations implementing this section . . . .").

One such regulation is 5 C.F.R. § 2635.805(a), a provision central to the present dispute between the parties. Section 2635.805(a) provides pertinently as follows:

(a) Restriction. An employee shall not serve, other than on behalf of the United States, as an expert witness, with or without compensation, in any proceeding before a court or agency of the United States in which the United States is a party or has a direct and substantial interest, unless the employee's participation is authorized by the agency under paragraph (c) of this section. . . .

*Id.*[4]

The government contends Dr. Beckson's non-compliance with that regulation precludes his participation in this case. The government is correct that the regulation appears to cover Dr. Beckson, who is employed on a part-time basis by the government. Additionally, the defense offers Dr. Beckson for service at trial as an expert witness, a proceeding in which the government is a party. It remains to be seen, however, whether the regulation precludes Dr. Beckson from testifying under the circumstances here presented.

Indeed, the defendant makes several arguments to avoid Dr. Beckson's exclusion. One of defendant's contentions has some merit. He asserts the government is essentially asserting a privilege on behalf of Dr. Beckson, one that has been rejected in the civil context on a number of occasions. The cases cited by the defendant are *Dean v. Veterans Admin. Regional Office,* 151 F.R.D. 83 (N.D.Oh.1993); *In re Air Crash Disaster at Detroit Metro. Airport,* 737 F.Supp. 399 (E.D.Mich.1989); *McElya v.*

---

**4.** The exceptions found in subsection (c) provide as follows:

(c) Authorization to serve as an expert witness. Provided that the employee's testimony will not violate any of the principles or standards set forth in this part, authorization to provide expert witness service otherwise prohibited by paragraphs (a) and (b) of this section may be given by the . . . [DAEO] of the agency in which the employee serves when:

(1) After consultation with the agency representing the Government in the proceeding or, if the Government is not a party, with the Department of Justice and the agency with the most direct and substantial interest in the matter, the . . . [DAEO] determines that the employee's service as an expert witness is in the interest of the Government; or

(2) The . . . [DAEO] determines that the subject matter of the testimony does not relate to the employee's official duties within the meaning of § 2635.807(a)(2)(I).

*Id.* The regulation is cast in discretionary terms. As noted, the DAEO in this matter, Mr. Hall, has refused the requested authorization. It is not suggested that subsection (b), which relates to special government employees, is pertinent here.

*Sterling Medical, Inc.,* 129 F.R.D. 510 (W.D.Tenn.1990); *Young v. United States,* 181 F.R.D. 344 (W.D.Tex.1997).

*Dean* is illustrative of the remaining cases. In *Dean,* plaintiff instituted an action against the VA for handicap discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 791. Dean caused a subpoena duces tecum to issue commanding a VA-employed physician to testify as an expert witness for Dean. The VA moved to quash. In denying the motion, the district court observed as follows:

> The question before this Court is essentially, to what extent can an agency regulation *curb the power of this court to compel discovery under the Federal Rules of Civil Procedure?*
>
> Requiring this Court to quash the subpoena based on 5 C.F.R. § 2635.805, *is tantamount to permitting the ethics regulation to restrict this Court's broad discovery powers under Rules 30 and 34 of the Federal Rules of Civil Procedure.* There is no authority for that type of restriction. . . .
>
> .   .   .   .   .
>
> The regulation involved here was promulgated under the Ethics in Government Act, whose stated purpose was "to prevent corruption and other official misconduct before it occurs, as well as penalizing it once it is uncovered." *The VA has presented no evidence that the regulation was meant as anything other than a guide for employee action and*

*an attempt to eliminate misconduct.* There is no authority for enforcing such a provision in the midst of unrelated civil litigation. *This Court declines to allow an employee ethics regulation to curb its own discovery power under Rules 30 and 34.*

*Id.* at 86–87 (citations omitted) (emphasis supplied).

*Dean,* the remaining cited cases, and others left uncited,[5] stand for the proposition that the Executive cannot override the civil discovery powers Congress granted to the district court. It is true that these cases were decided in a civil context. That observation, however, seems to help the defendant's cause. It would be a bit of a non-sequitur to restrict application of the regulation in the civil context, while allowing its unfettered application in a situation where a defendant, within weeks of his federal capital trial, confronts the prospect of losing his key mitigation witness as a result.[6]

The government contends the defendant is not entitled to an expert of his choosing. That argument is unassailable. *See, e.g., Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) ("This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed. . . .");

---

**5.** *See, e.g., Roby v. Boeing Co.,* 189 F.R.D. 512, 518 (S.D.Ohio 1999).

**6.** The government attempts to lay blame for violation of the regulation entirely at the defendant's feet. The court accepts defense counsel's representation that both they and Dr. Beckson were unaware of the cited regulations. Additionally, defendant notes the circumstances surrounding one Dr. Jonathan Pincus, a physician and Chairman of the Veterans Affairs Medical Center in Washington.

It appears that Dr. Pincus has testified previously in a number of federal cases on behalf of defendants charged with capital crimes. Government counsel in those cases do not appear to have lodged any objection to Dr. Pincus' participation. The court is thus left to speculate concerning how widely known the regulation may be within the VA when two of its physicians of the highest caliber appear to be operating without any knowledge of its existence.

*Walton v. Angelone,* 321 F.3d 442, 464 (4th Cir.2003) ("Walton had no constitutional right to insist on the appointment of any particular expert."); *Wilson v. Greene,* 155 F.3d 396, 401–02 (4th Cir.1998) (holding that the Constitution does not entitle a criminal defendant to the effective assistance of an expert witness). The defendant does not contend otherwise.

Instead, defendant points out that Dr. Beckson is one of a select group of death penalty experts that can effectively present a substance-abuse case in mitigation. As noted by defendant, that select group is further diminished by virtue of the fact that trial is now nearly imminent. Additionally, as noted, the defendant has apparently forged a relationship with Dr. Beckson that likely would not be duplicated with a similar expert in the short time remaining before trial commences. Under these circumstances, the court concludes that *Dean,* and the other, similar cited cases, should be applied here by analogy so as to permit Dr. Beckson to serve as an expert witness for the defendant in this action.

To avoid that result, the government relies heavily upon *Ueland v. United States,* 291 F.3d 993 (7th Cir.2002). The case involved an inmate's Federal Tort Claims Act suit alleging that he was injured in a collision between a prison van in which he was riding and a chase car protecting it. The inmate's contention that he suffered serious bodily injuries was partially supported by Dr. James Reed, a physician employed by the Bureau of Prisons who examined Ueland and testified at the bench trial which resulted in Judgment for the United States.

The court of appeals reversed the Judgment and remanded for a new trial by virtue of the district court's failure to make "any" findings of fact as required by Fed.R.Civ.P. 52(a) as well as the erroneous exclusion of certain deposition evidence.

It was only after a discussion of those overarching issues, and a recognition that the case would have to be re-tried, that the appellate court directed that a *Daubert* inquiry be conducted as to a witness of dubious qualifications who had been offered as an expert and then turned its attention to other matters:

> One other dispute related to Reed may crop up on remand. Before trial, Ueland's lawyers repeatedly conferred with Dr. Reed, in apparent violation of 28 C.F.R. §§ 16.21–16.29, which provide that private litigants and their lawyers may contact federal employees only under defined circumstances....
>
> In response to the first argument, the Assistant United States Attorney filed a memorandum discussing the regulations that govern the means of obtaining information from federal employees. The district judge refused to read this memorandum or listen to argument on the subject. Instead he peremptorily announced that, because the Supreme Court had required President Nixon to provide evidence, *see United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), no limits may be placed on private lawyers' contacts with federal employees. We have no idea how the *Nixon* case could be thought to support that proposition.... District judges must implement federal regulations, no less than federal statutes, and we have held that §§ 16.21–16.29 are valid. *See Edwards v. Department of Justice,* 43 F.3d 312, 317 (7th Cir.1994). Access to federal employees who may have evidence remains available through the normal discovery process. (The United States produced Reed for a deposition and again at trial.) *Similarly, 5 C.F.R. § 2635.805 defines the circumstances under which a federal employee such as Dr. Reed may be an expert witness as opposed to a fact witness on*

*Ueland's behalf. The district court, which failed to apply this regulation during the first trial, must do so on remand.*

Id. at 998–99 (emphasis supplied).

Had the court of appeals believed, as posited by the government, that the exclusion of Dr. Reed was necessary, one would have expected it to have so held categorically. Instead, in the space of two sentences, the question concerning section 2635.805 was raised and addressed by the court and left open on remand with the admonition that the district court "apply" the regulation with respect to Dr. Reed. *Id.* at 999. The history of the case as stated by the court of appeals suggests that Dr. Reed may very well be a witness at the retrial.

Whatever the holding in *Ueland* may be as to the reach of section 2635.805 in a civil setting, this action is a capital criminal case that may one day culminate in the sovereign executing the defendant. The court adheres to its earlier stated view that, under the circumstances of this case, Dr. Beckson should be permitted to serve as an expert witness for the defendant.

In so ruling, however, the court is left with the government's contention that Dr. Beckson's participation in this case might result in criminal sanctions against him under the Act. Indeed, some of the cases cited by the defendant observe the specter of criminal liability for government expert witnesses who, as in this case, choose to testify despite regulations that arguably preclude their participation. In *Young,* a case involving section 2635.805, the district court observed as follows:

> Testimony contrary to the provisions of 5 C.F.R. § 2635.805 invites prosecution for a violation of the Ethics In Government Act, 18 U.S.C. § 207. Moreover, because of the possibility of prosecution, a federal employee whose testimony would violate 5 C.F.R. § 2635.805 may

invoke his Fifth Amendment privilege against self-incrimination in order to avoid giving testimony which could subject him to prosecution. Cf. *United States v. Kordel,* 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). In other words, the Government has the power to criminalize unauthorized, non-compelled expert testimony by its employees, and the employees have a right to avoid criminal prosecution by invoking the Fifth Amendment.

*Young,* 181 F.R.D. at 348; *see also In re Air Crash Disaster,* 737 F.Supp. at 405–06 ("However, although this Court will not preclude the testimony of Waterman and Morris based on the terms of section 207, each of these witnesses should know that this decision does not, and will not, immunize them from the potential of criminal prosecution in the future.").

The government has cited both 18 U.S.C. § 203 and 205 as potential fonts of criminal liability for Dr. Beckson should he choose to testify. The government has not identified its prosecution theory against Dr. Beckson in any detail. Mr. Westfall did, however, state as follows at the March 23, 2007, hearing:

> There is potential liability under that under 18—I'm not a criminal expert, but I remember the numbers—18 U.S.C., Section 203 and possibly even Section 205 since Dr. Beckson is a current employee of the government.

> .    .    .    .    .

> [T]he criminal statute is very plain under Section 203 of Title 18. It says specifically that a government employee cannot testify in a proceeding as an expert witness on behalf of another party where the government is a party to the case. The statute says that specifically, and it's obvious in this case that Dr.

Beckson will be taking a position adverse to the government.

(Trans. at 11–12, 15).[7]

Section 203 prohibits government employees from receiving compensation in exchange for "representational services, as agent, attorney or otherwise, rendered ... in relation to any proceeding ... or other particular matter in which the United States is a party." *See generally* Ragan Naresh *et al., Public Corruption,* 43 Am. Crim. L.Rev. 825, 851–52 (2006). Section 205 prohibits those same employees from acting as agent or attorney for any individual before any court in connection with a covered matter in which the United States is a party. *Id.* The government's argument, however, remains perplexing.

Both statutes contain safe-harbor provisions, each providing that "[n]othing in this section prevents an" individual "from giving testimony under oath...." 18 U.S.C. §§ 203(f), 205(g). There is scant authority addressing the reach of these provisions. One decision, however, is similar to the present factual scenario.

In *DeMarrias v. United States,* 713 F.Supp. 346 (D.S.D.1989), plaintiff sued the government under the Federal Tort Claims Act. Plaintiff had earlier been examined by a physician employed part-time by the VA, Dr. Jesse Easton. Dr. Easton examined plaintiff as a part of her private practice. The government later prohibited Dr. Easton from testifying based, in part, on sections 203 and 205. After concluding section 203 had no application, the court analyzed section 205 and its safe-harbor provision:

> This Court can find no cases where an individual who works part-time for a governmental agency has been found to have violated § 205 by testifying in a case against the United States. Indeed, § 205 expressly states that "[n]othing herein prevents an officer or employee from giving testimony under oath ..." Certainly, § 205 is somewhat cryptic and there is virtually no authority to guide this Court in applying § 205 to this case. Nonetheless, it is clear that the purposes of § 205 are not disserved by permitting Dr. Easton to testify about her observations and findings concerning the examination of the plaintiff that Dr. Easton conducted as part of her private practice.

*Id.* at 347.[8]

The government's position becomes yet more vexing when one compares the safe-harbor provisions found in sections 203 and 205 with the similar carve-out contained in section 207, a statute governing,

---

**7.** Despite Mr. Westfall's representations, the court has searched section 203 in vain for the referenced language relating to expert witnesses.

**8.** The United States Court of Appeals for the Fifth Circuit addressed a situation where a government attorney cautioned a government employee that he faced criminal sanctions under sections 203 and 205 if he testified for a party suing his government employer. The court of appeals observed as follows:

> These two code sections address compensation to government officials and activities of government officials. Both sections exclude from punishment or sanction the giv-

ing of testimony under oath. § 203(f) expressly provides that:

> Nothing in this section prevents an individual from giving testimony under oath or from making statements required to be made under penalty of perjury.

§ 205(g) is similar; it differs only in the last phrase which is "under penalty for perjury or contempt."

> The court did not abuse its discretion in assessing sanctions against the Commission's attorney. An attorney who intimidates a witness commits a serious infraction, and the district court's sanctions were entirely appropriate.

*Kelly v. Panama Canal Comm'n,* 26 F.3d 597, 603 (5th Cir.1994).

*inter alia,* former federal employees. The section 207 safe harbor provides as follows:

> (6) Exception for testimony.—Nothing in this section shall prevent an individual from giving testimony under oath, or from making statements required to be made under penalty of perjury. Notwithstanding the preceding sentence—
>> (A) a former officer or employee of the executive branch of the United States (including any independent agency) who is subject to the restrictions contained in subsection [207](a)(1) with respect to a particular matter may not, except pursuant to court order, serve as an expert witness for any other person (except the United States) in that matter. . . .

18 U.S.C. § 207(j)(6). The first sentence of the section 207 safe harbor is nearly identical to its counterparts in sections 203 and 205. Section 207, however, contains additional provisions specifically restricting expert witness testimony by former federal employees, provisions completely absent from sections 203 and 205.

In view of the safe-harbor provisions found in section 203 and 205, the plain-meaning interpretation accorded them by existing case law, and the absence of explicit expert witness restrictions in sections 203 and 205, the court has difficulty envisioning circumstances under which Dr. Beckson would be subject to prosecution under the statutes identified by the government.[9]

Although the court will permit Dr. Beckson to testify, the ruling is contingent upon defendant's commitment to undertake two reciprocal actions designed to ameliorate any resultant prejudice to the government and to foster the ever-present concern of judicial economy. First, the government suggests that the putative conflict of interest of Dr. Beckson in testifying against his employer exposes any eventual judgment against the defendant to collateral attack.[10]

---

9. The court is hesitant to invite further explanation from the government on the point. In view of Dr. Beckson's central importance to the defense in this capital case, even seemingly benign advice from the prosecuting authority concerning potential criminal liability resulting from his testimony may implicate the Sixth Amendment. In *United States v. Golding,* 168 F.3d 700 (4th Cir.1999), our court of appeals summarized an earlier decision worthy of consideration:

> In *United States v. MacCloskey,* 682 F.2d 468, 475 (4th Cir.1982), the government's attorney suggested to a prospective witness's attorney that "he would be well advised to remind his client [the witness] that, if she testified at MacCloskey's trial, she could be reindicted [for conspiracy to murder] if she incriminated herself during that testimony [for MacCloskey]." We held that the government's suggestion to the attorney for the witness, as just related, "destroyed the choice ... [of the witness] to testify freely." 682 F.2d at 479. We held that the error was not harmless and that it "independently warrants the grant of a new trial." 682 F.2d at 479.

*Id.* at 704.

10. The government identifies several putative conflicts of interest it contends would undermine the integrity of the judicial process if Dr. Beckson testifies. First, the government notes that Dr. Beckson's testimony would expose him to challenge on cross examination by government counsel, placing the government in the untenable and embarrassing position of discrediting the skill and methods of its own employee. Second, should such an attack occur, the government asserts it might impact any future claims against the government arising out of Dr. Beckson's government employment or the government's use of him in an expert capacity in future litigation.

The concerns are easily resolved. Upon request, and if necessary based upon what actually occurs during Dr. Beckson's cross examination, the court will consider entry of an appropriate protective order covering all or part of the cross examination of Dr. Beckson, if warranted by law. Additionally, under the circumstances the defendant may be willing to stipulate that the jury is not to be informed of Dr. Beckson's status as a part-time government employee. The court leaves that matter to the parties in the first instance.

In order to procure Dr. Beckson's testimony, the defendant's counsel has stated the defendant's willingness to waive any putative conflict of interest or related argument in a later collateral proceeding. (Trans. at 11 ("So, as to the first waiver of a conflict of interest, with consultation with the defendant having been made, we can waive the first problem, that we don't have any problem with a conflict of interest if indeed there is one.")). Additionally, in the event Dr. Beckson chooses at trial to exercise his Fifth Amendment privilege, the court will expect the defendant to have waiting in the wings a qualified expert acceptable to the defendant to stand in Dr. Beckson's stead and provide the proffered mitigation evidence.[11]

### III.

Based upon the foregoing discussion, the court ORDERS as follows:

1. That defendant's ex parte, sealed motion in limine to permit testimony by his penalty phase expert be, and it hereby is, granted, with the proviso that defendant first waive any conflict of interest or argument for collateral relief arising out of Dr. Beckson's testimony and have in waiting a suitable replacement expert as more fully set forth previously, and

2. That the government's motion to exclude Dr. Beckson be, and it hereby is, denied.

The Clerk is directed to file this written opinion and order in a sealed, ex parte fashion under the Death Penalty Case Events listed under the Criminal Events portion of the CM/ECF site. The court's law clerk is directed to hand deliver copies of this written opinion and order, with appropriate guarantees of confidentiality, only to Mary Lou Newberger, Federal Public Defender, and Fred B. Westfall, fire-walled Assistant United States Attorney. No other copies of this written opinion and order shall be distributed.

---

11. The government also appears to contend that Federal Rule of Evidence 403 counsels against allowing Dr. Beckson to testify. The argument is not meritorious.